IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 16–103–BLG–SPW |
| Plaintiff/Respondent, | |
| vs. | OPINION |
| TERRANCE TYRELL EDWARDS, | and ORDER |
| Defendant/Movant. | |

In September 2016, Defendant/Movant Terrance Tyrell Edwards was arrested in Billings, Montana on suspicion of promoting prostitution. He was subsequently arraigned on a federal complaint charging him with sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1591. In October 2016, he was indicted by a grand jury, (*see* Docs. 3, 8), and in January 2018, he went to trial on ten charges related to the sex trafficking of four adult women, transporting three minors across state lines with the intent to sex traffic them, and witness tampering. (*See* Doc. 212 (Fourth Superseding Indictment).) After an eight-day jury trial, Edwards was convicted on all ten counts, (*see* Doc. 287), and, in June 2018, Edwards was sentenced to a total custodial term of 360 months, (Docs. 323, 344). In 2020, Edwards' conviction and sentence were affirmed on appeal. (*See* Docs. 393, 394.) He now seeks federal habeas relief under 28 U.S.C. § 2255. (Docs. 400, 403, 410, 411, 424.) For the reasons provided below, his motion is denied.

1

**BACKGROUND**

## I.   Arrest and Pretrial Proceedings

On September 20, 2016, law enforcement in Billings, Montana received a report that a woman, JR, had been kidnapped and was a victim of human trafficking. (Doc. 1 at 3.) Officer Gary Seder of the Montana Department of Justice Division of Criminal Investigations and Special Agent Brandon Walter with the Federal Bureau of Investigation went to the Rodeway Inn and interviewed JR. (*Id.*) JR told them that she met Edwards on an online dating site with the expectation they would begin a romantic relationship. (*Id.*) Edwards instead posted ads for her "services" on Backpage.com in Missoula, Salt Lake City, and Billings; JR engaged in "dates" with clients at these locations; and Edwards kept the money from her encounters. (*Id.* at 3–4.) JR also told law enforcement that, during this same time, Edwards went to Washington state and picked up another woman, AT, for the same purpose. (*Id.* at 4.) She further stated that Edwards had gone to North Dakota to pick up additional girls. (*Id.* at 5.) When Edwards returned to the Rodeway Inn the next morning, law enforcement detained him, seized his cellphone and car, and located three underage women—AS, KS, and DR—Edwards had brought back with him. (*Id.* at 6.)

On September 23, Edwards was charged by criminal complaint with sex trafficking by force, fraud, or coercion in violation of 18 U.S.C. § 1591. (*See* Doc.

1.) Assistant Federal Defender Steven Babcock[1] represented him at his initial appearance and waived a preliminary hearing, (*see* Doc. 3), over Edwards' objection, (*see* Doc. 206 at 1). Babcock withdrew a month later, citing a conflict of interest. (*See* Docs. 14, 15.) In October 2016, CJA counsel Vernon Woodward was appointed. (*See* Docs. 15, 18.) Woodward had the case for approximately seven months, during which time Edwards was arraigned on three superseding indictments. (*See* Docs. 28, 55, 112.) Woodward also asked for several trial continuances, allegedly without Edwards' knowledge. (*See* Doc. 206 at 2.) In May 2017, Edwards filed a pro se motion to substitute counsel based on Woodward's failure to file pretrial motions or subpoena records and Woodward's alleged advice that Edwards should not proceed to trial as a black man in Montana. (Doc. 126.) Woodward disagreed with Edwards' recitation of the facts but agreed that substitution was appropriate given Edwards' "obvious displeasure with present counsel." (Doc. 127.)

In May 2017, CJA counsel Palmer Hoovestal was appointed. (Doc. 130.) Trial was set for the end of September 2017. (*See* Doc. 148.) In mid-September 2017, Hoovestal filed motions in limine, seeking several pretrial rulings. (*See* Docs. 163, 164.) Two days later, the Court received a pro se letter from Edwards

---

[1] Assistant Federal Defender Andrew Nelson was also appointed to represent Edwards, (*see* Doc. 5), but he never appeared.

requesting new counsel on the ground that, in the four months Hoovestal had the

case, Hoovestal visited Edwards once in June and they spoke on the phone once in

August. (*See* Doc. 166.)  In his response, Hoovestal indicated that while his oral

communication with Edwards was limited, "[t]here ha[d] been ample written

communication" and Edwards' "written communications tend[ed] to provide more

substantive information than . . . his oral communications." (Doc. 170.)  At the

subsequent hearing on the motion, Edwards withdrew his request to substitute

Hoovestal, indicating that the two had since spoken and that Hoovestal was

attempting to get the requested phone and email records.  (*See* Doc. 418; *see also*

Doc. 126.)  Trial was continued to January 2018.  (Doc. 187.)

On December 5, 2017, Edwards filed a second request to substitute

Hoovestal, alleging that Hoovestal was still not investigating his case or

responding to his phone calls.  (*See* Doc. 199.)  Specifically, Edwards wanted

Hoovestal to request a *Franks*[2] hearing and to file a motion to suppress because

Officer Seder drove Edwards' car from the hotel to the police station after

Edwards' arrest.  (*See id.*)  Hoovestal again responded, indicating that while he

once again had not spent much time meeting with Edwards, he had spent a

significant amount of time reviewing discovery, attempting to contact witnesses,

and preparing for trial. (*See* Doc. 201.)  Hoovestal further explained that he did

---

[2] *Franks v. Delaware*, 438 U.S. 154 (1978).

not believe a motion to suppress was warranted and that there were no grounds for a *Franks* hearing. (*See id.*)

On December 18, 2017, Edwards filed another letter requesting that Hoovestal be substituted as counsel, once again citing his failure to adequately prepare the case and communicate with his client. (*See* Doc. 206.) Edwards also filed a complaint against Hoovestal with the Office of Disciplinary Counsel on these same grounds. (*See* Doc. 207 (Hoovestal's response).) On December 19, 2017, the Court held a second substitution hearing. (*See* Doc. 226.) The Court heard from both Hoovestal and Edwards and determined that while Edwards disagreed with certain litigation tactics, Hoovestal was providing effective representation. (*See id.*) Accordingly, Edwards' second request to substitute Hoovestal was denied. (Doc. 210.) Edwards subsequently submitted numerous pro se "motions" seeking, *inter alia*, additional discovery and an evidentiary hearing. (*See* Docs. 221, 225, 239, 240, 270.)

## II.    Trial[3]

An eight-day trial was held in January 2018. The government called 24 witnesses, including four experts, and admitted over 100 exhibits. According to the government, Edwards forced four adult women—SE, HC, JR, and AT—to engage in commercial sex in violation of 18 U.S.C. §§ 1591(a), 2421, and

---

[3] The trial transcript is cited as "(Tr. [page #].)"

transported three minors—KS, AS, and DR—across state lines with the intent to sex traffic them in violation of 18 U.S.C. § 2423(a).[4]  (*See* Doc. 256.)  Edwards also contacted two of the victims after he was arrested—JR and KS—in an attempt to influence their testimony in violation of 18 U.S.C. §§ 1512(b)(1), 1591(d).  (*See id.*)  In his defense, Edwards called two witnesses, himself and one of the victims, AT.[5]  The defense theory of the case was that Edwards was engaged in a legitimate escort service and that any sex acts performed by the alleged victims was their own choice.  (*See* Tr. 36–40, 43.)  The government presented its case chronologically, which is how the trial evidence is summarized below.  Also discussed below is Edwards' defense to each charge.

## A.  Prior Sex Offense and Release from Custody

In 2011, Edwards was convicted in Missoula County of promoting prostitution in violation of state law.  (Ex. 57.)  More specifically, he met a woman named AC in 2010 an offered to be her "pimp."  (Tr. 459.)  He set up "dates" for her, and she gave him the money from those encounters.  (Tr. 460.)  AC felt like Edwards forced her to engage in this conduct as she thought he was her boyfriend.

---

[4] Edwards was also charged and convicted of providing marijuana to a minor in violation of 21 U.S.C §§ 841(a)(1), 859(a), 844(a).  (Doc. 212, Count 9.)  He admitted guilt to this charge, (*see* Tr. 1554; Doc. 358 at 23), and does not raise any issues directly related to it in the present motion.

[5] Edwards' codefendant, Francine JoAnn Granados, did not call any witnesses.  Granados was charged with one count of tampering with a witness, victim, or informant in violation of 18 U.S.C. § 1512(b)(1) (Count 7).  (Doc. 212.)

(Tr. 465.)  Edwards ultimately served 52 months in custody following a probation violation, (Tr. 1125), and in March 2016, he was released from custody and returned to Missoula, (Tr. 54–55), where he got a job at the Motel 6, (Tr. 213).

### B.    Count 2: Sex Trafficking of SE

In April 2016, Edwards met SE in Missoula and they began a romantic relationship.  (Tr. 246, 289, 291.)  SE was working two jobs, and Edwards told her that she could make better money prostituting.  (Tr. 250.)  In May and June 2016, Edwards typed up a Backpage ad for SE, which SE posted at his direction.  (Tr. 272–78, 296, 300; *see* Ex. 6.)  SE went on two "dates" based on contacts made through the ad and made $300, which she gave Edwards.  (Tr. 252–56.)  Although the first "date" did not involve any sex, the second one did.  (Tr. 253–56.)  Edwards provided SE with condoms.  (Tr. 266.)  Edwards eventually asked SE to get a friend involved—a "hoe buddy"—and SE acquiesced.  (Tr. 267.)  The friend used the same Backpage account as SE and they did approximately three calls together before SE and the friend fled to Kalispell in June to get away from Edwards.  (Tr. 268–69, 337–38; *see* Ex. 7.)

During their time together, Edwards spit in SE's mouth as a test of loyalty, (Tr. 257–58); struck her for giving money to her sister and "looking" at his friend, (Tr. 258, 305); bit her, (Tr. 258); threatened to kill and bury her, (Tr. 259); punched her in the stomach when she tried to retrieve her phone from him, (Tr.

7

260, 308); and hit her in the head and threatened to drown her, (Tr. 261). Edwards also imposed rules, telling SE she could not look at other men (which he called "reckless eyeballing"), she had to call him "daddy," and they could never text each other directly about prostitution. (Tr. 264.) SE testified that she went along with Edwards because she was afraid of him. (Tr. 263.)

According to Edwards, he and SE were in an intimate relationship and she needed money so decided to engage in escort services with his help. (Tr. 1161.) She used her own pictures and posted her own ad on Backpage. (Tr. 298, 300, 1205.) She was so into it that she then recruited a friend with whom Edwards never had contact and then the two of them posted their own ads. (Tr. 313–14, 1223.) Edwards also testified that he explicitly told her not to engage in sex but that because he was not "in the room" he could not control what happened. (Tr. 1214.) As it relates to any rules or abuse, Edwards maintains that such conduct fell within the purview of their domestic relationship and was not at all motivated by any intent to use SE for commercial sex work. (Tr. 1193–95, 1199–202.)

### C.    Count 11: Sex Trafficking of HC

In July 2016, Edwards met HC in Missoula. (Tr. 385–87, 424.) She agreed to travel to Billings with Edwards to "make money," although HC believed that meant they were going to deal drugs. (Tr. 396, 437.) Instead, Edwards created a Backpage ad for HC, (Tr. 395, 408–09; Ex. 10), and gave her condoms and prices

8

before sending her on no less than 10 commercial sex "dates." (Tr. 402, 411, 412.)
Except for a small amount of money HC withheld to pay her babysitter back home,
all of the money from these encounters went to Edwards. (Tr. 410–11.) When
they returned to Missoula, HC kept casual contact with Edwards because she felt
"a little bit safer knowing what was up with him." (Tr. 418.) Despite further
requests by Edwards, however, HC did not engage in any more commercial sex
acts. (Tr. 421.) During their time together, Edwards forced HC to have sex with
him, (Tr. 415), he gave her drugs, (Tr. 417), and he made her hold the drugs while
they were driving so that she would have them if they were pulled over by law
enforcement, (Tr. 418). HC testified that she felt like she could not go to law
enforcement or counter Edwards' demands because she was carrying the drugs.
(Tr. 441.) Edwards never hit her or physically threatened her and told her that she
did not have to do anything she did not want to do. (Tr. 443–44.) HC did not
believe him, however, and indicated that Edwards played "mind games." (Tr.
455.)

According to Edwards, HC was a drug addict with financial problems that
used him for drugs and money. (Tr. 430, 436, 1235, 1250.) He never hit or
threatened her, (Tr. 443, 455), and she was the one that initiated their sexual
encounter in Billings, (Tr. 1254–55).

**D.    Count 1: Sex Trafficking of JR**

9

In September 2016, JR met Edwards through a dating website. (Tr. 581.) She traveled to Missoula from Polson to meet him shortly thereafter. (Tr. 583.) At their first meeting, Edwards took her lingerie shopping and later asked her to pose for provocative photos wearing it. (Tr. 584–86.) JR believed it was the beginning of a romantic relationship. (Tr. 587.) Edwards instead took her to a hotel and started talking to her about prostitution. (Tr. 589.) During that conversation, Edwards referred to JR's daughter and made it seem as though he had a firearm. (Tr. 590.) Despite JR's objections, Edwards posted a Backpage ad for her and she started working that night, going on six to eight "dates." (Tr. 591–93.) She made approximately $1,500, all of which went to Edwards. (Tr. 594.) Edwards then took her to Billings where they did the same thing. (Tr. 596.) Edwards once again took all the money and provided the condoms. (Tr. 603.) After Billings, JR and Edwards went to Salt Lake City for two days, where Edwards had her "walk" the streets. (Tr. 606.) JR had approximately 20 customers in Salt Lake City, and Edwards took all the money she made. (Tr. 608.) JR had a "quota" and was generally expected to make $2,000 per day. (Tr. 608.)

When they returned to Missoula, Edwards told JR that they were going to Washington "to get another girl for work." (Tr. 612.) After going to Washington to pick up AT—a trip discussed in more detail below—Edwards, JR, and AT returned to Billings, where Edwards once again posted a Backpage ad for JR. (Tr.

10

614.)  Edwards then told JR that he was going to North Dakota to pick up more girls, leaving JR and AT in Billings.  (Tr. 615.)  That night, JR and AT went on a commercial sex date and made $200.  (Tr. 615.)  AT then snorted pills before leaving the hotel room.  (Tr. 615–17.)  After AT left, JR called her best friend back in Polson, who called law enforcement, who came to the hotel and ultimately arrested Edwards.  (Tr. 617–19.)

During their time together, Edwards imposed several rules on JR, including that she was not to look at other men, had to call him "daddy," walk behind him, and not talk to other people.  (Tr. 599.)  While in Billings, Edwards hit JR in the face for looking at another man, causing her to bleed.  (Tr. 599.)  JR testified that she did not seek help from law enforcement because she was afraid of Edwards. (Tr. 618.)

According to Edwards, JR voluntarily engaged in the conduct described above as evidenced by the fact that she only knew him for approximately one day before agreeing to engage in commercial sex, (Tr. 642); had told friends and family that she was okay while she was traveling with Edwards, (Tr. 646–47, 683, 701); and was setting up her own dates, which included messaging potential clients, (Tr. 660, 673).  JR also asked Edwards in a text message if he could "make [her] stuff stand out more."  (Ex. 555; Tr. 636, 670, 1296.)  Edwards also noted that she had many opportunities to seek help if necessary and did not do so.  (Tr. 688.)  For

example, while in Missoula, JR was alone in a car when it was pulled over by law enforcement but said nothing. (Tr. 684.) He also testified that she was not subject to any "rules," but rather "safety parameters," such as contacting him regularly while she was escorting men. (Tr. 1269, 1285.) Finally, Edwards emphasized that JR was mad at him for leaving her in a room while AT did drugs and for leaving her to go pick up other women. (*See* Ex. 4.)

### E.   Count 8: Transportation of AT

While in custody in 2010, Edwards met Anthony Brazington, who was also serving time for promoting prostitution. (Tr. 548–49.) Edwards and Brazington reconnected when Edwards was released in 2016, and in August or September, Brazington provided Edwards with the contact information for AT, the prostitute involved in Brazington's case from 2010. (Tr. 550; Ex. 132.) AT was living in Washington, (Tr. 551), and Edwards left Missoula to go pick her up, (Tr. 552–53). As indicated above, Edwards told JR he was going to "get another girl for work" or a "working girl." (Tr. 612–13.) Edwards then brought AT back to Montana, taking her and JR to Billings. (Tr. 614.)

### F.   Counts 3, 4, 5: Transportation of Minors KS, AS, and DR

After Edwards arrived in Billings with JR and AT on September 20, he continued on to North Dakota, telling JR that he was going to "[p]ick up more girls for prostitution." (Tr. 615.) Since August, Edwards had been messaging AS, a

fifteen-year-old girl in Fargo. (Tr. 762–63; Ex. 32A.) AS interpreted their communication to mean Edwards wanted her to come to Montana to make money, or "paper," through prostitution. (Tr. 767, 770, 774, 787.) When the time finally came to travel with Edwards back to Montana, AS was joined by her friends KS, age 17, and DR, age 16. (Tr. 719, 797.) KS had also communicated with Edwards prior to the trip and believed that he intended to have them come to Montana to "make some money" in exchange for sex. (Tr. 720, 727; see Exs. 34A, 35A.) KS had previously engaged in prostitution and wanted to ensure AS knew what she was getting into. (Tr. 726–27.) Although DR did not communicate with Edwards beforehand, he asked her whether she wanted to "make money" as she got in the car. (Tr. 777, 799.) During the car ride, Edwards provided the girls with marijuana. (Tr. 729, 778, 799.)

According to Edwards, while he did approach AS about coming to Montana to make money, he never mentioned prostitution but rather intended to have her "model" purses that he had made while in custody. (Tr. 753, 780, 783.) Edwards also emphasized that AS believed, at worst, that they were going to Montana to deal drugs. (Tr. 789.) Additionally, DR testified that the first time she learned about the prostitution plan was from law enforcement, (Tr. 802), and that she was surprised by it because she would never engage in such conduct, (Tr. 805). As it

relates to their ages, all three girls told Edwards they were over 18.  (Tr. 789, 798; Ex. 135.)

### G.     Count 6: Obstruction re JR

After Edwards was arrested, JR received messages from his Facebook account.  (*See* Ex. 4.)  Those messages were sent by Edwards' longtime girlfriend and codefendant, Francine Joann Granados, at Edwards' direction.  (*See* Tr. 966–97, 989–90; Exs. 103, 104, 105, 106, 108, 109, 111, 112, 113.)  In them, Edwards implied that he was not in trouble for his conduct vis-à-vis JR and that he and JR could still be together, but she needed to contact Edwards' attorney and "tell them you lied."  (*See* Ex. 4.)

According to Edwards, there was not a "no-contact" order in place and his indirect contact with JR was completely appropriate as it was not intended to influence her testimony.  (Tr. 1014–15, 1369–71.)

### H.     Count 10: Tampering with KS

In March 2017, Edwards called KS from jail "to make sure [she] didn't say anything or any of the other girls that were with [her] didn't say anything."  (Tr. 731–32; Exs. 37, 38, 39, 40.)  He also asked her to reach out to AS.  (Tr. 731–32.)  As was the case with JR, Edwards insists that this contact was not in violation of any court order and was not to influence KS's testimony.

## III.   Verdict and Sentencing

On February 8, 2018, the jury returned a verdict, finding Edwards guilty of all ten counts with which he was charged. (*See* Doc. 287.) Edwards was sentenced on June 21, 2018. (*See* Doc. 358 (transcript).) There were no objections to the presentence report, (*see* Doc. 327), and with a total offense level of 41 and a criminal history category of VI, the advisory guideline range was 360 months to life imprisonment, (Doc. 358 at 4–5). In his allocution, Edwards was critical of the government's conduct and defense counsel's performance, stating "I stand here today convicted for 10 crimes, 9 of which never occurred; and having had my 4th, 5th, 6th, and 14th Amendment rights violated." (*Id.* at 23.) Ultimately, Edwards was sentenced to 360 months concurrent for each act of sex trafficking and transportation of a minor (Counts 1, 2, 3, 4, 5, 11); 120 months concurrent for the transportation of AT (Count 8); 240 months concurrent for tampering with KS (Count 10); 240 months concurrent for interfering with the investigation as it relates to JR (Count 6), and 24 months concurrent for providing a minor with marijuana (Count 9). (*Id.* at 46, 52.) As a result, Edwards was sentenced to a total term of 360 months in custody followed by a lifetime of supervision. (*Id.* at 46.)

## IV.   Appeal

Edwards appealed, (Doc. 329), and on December 9, 2020, the Ninth Circuit issued an unpublished memorandum disposition affirming his conviction and sentence, (Doc. 393). Edwards unsuccessfully raised the following seven issues on

appeal: (1) whether it was plain error to instruct the jury that his use of the internet, a cell phone, or a hotel room necessarily had a *de minimis* effect on interstate commerce; (2) whether he had to know AS, KS, and DR's ages to be convicted of sex trafficking a minor; (3) whether the jury was properly instructed on "attempt"; (4) whether there was sufficient evidence supporting his conviction of unlawfully transporting AT across state lines; (5) whether the district court was the proper venue for the marijuana charge; (6) whether it was plain error to admit Facebook messages between Edwards and SE; and (7) whether it was an abuse of discretion to admit Edwards' prior conviction for promoting prostitution. (*See id.*)

## V.   Current Motion

On April 12, 2022, Edwards filed a pro se motion to vacate under 28 U.S.C. § 2255. (Doc. 400.) He then filed an amended pro se motion on September 9, 2022. (Doc. 403.) Counsel was appointed, (Doc. 404), and on May 1, 2023, counsel filed an amended motion, (Docs. 410, 411).[6] The government responded, (Doc. 419), and defense counsel filed a reply, (Doc. 424). Contemporaneously, Edwards filed three pro se affidavits. (*See* Docs. 422, 425, 426.)

---

[6] As noted by the government, counsel's amended § 2255 motion improperly incorporates by reference allegations from both Edwards's original, (Doc. 400), and supplemental, (Doc. 403), motions. (*See* Doc. 410; Doc. 404 at 2 (instructing that the amended § 2255 motion would "entirely supersede Edwards' *pro se* submissions").)

## ANALYSIS

Over the course of these proceedings, Edwards had five defense attorneys and, as made clear in the present motion, was dissatisfied with each one. Edwards' amended motion pursues claims of ineffective assistance of counsel, alleging both that he was constructively denied his right to counsel and that counsel was ineffective by: (1) waiving the preliminary hearing; (2) failing to move to suppress the evidence obtained following the search and seizure of Edwards' vehicle; (3) failing to challenge Edwards' seizure or move to suppress Edwards' post-arrest statements; (4) failing to challenge the search warrant under *Franks*; (5) failing to consult with Edwards and prepare him to testify; (6) failing to obtain or present impeachment evidence at trial; (7) failing to impeach the government's Rule 404(b) witness, AC; (8) failing to call JR's ex-husband as a witness; and (9) failing to raise any of the above issues on direct appeal. (*See* Docs. 410, 411.) Edwards further argues that even if these individual failings do not amount to a Sixth Amendment violation, their cumulative effect does. (*Id.*) Finally, in his reply, Edwards argues for the first time that appellate counsel was also ineffective for failing to challenge the sufficiency of the evidence as it relates to the transportation of minors under 18 U.S.C. § 2423(a). (*See* Doc. 424.)

Ultimately, the record shows that defense counsel made strategic decisions based on an informed understanding of the record in the case.

## I.    Timeliness

Edwards's direct appeal was finalized on October 4, 2021, when the United States Supreme Court denied certiorari. *See Clay v. United States*, 537 U.S. 522, 527 (2003). Edwards filed a pro se motion on April 11, 2022, (Doc. 400), that he supplemented on September 9, 2022, (Doc. 403). Because these filings occurred within § 2255's one-year filing period, Edwards' petition is timely.

## II.    Procedural Default

A defendant moving under § 2255 procedurally defaults his claims by failing to raise them on direct appeal and not showing cause and prejudice or actual innocence in response to the default. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Pollard*, 20 F.4th 1252, 1255–56 (9th Cir. 2021). However, "[c]onstitutionally ineffective assistance of counsel constitutes cause sufficient to excuse a procedural default." *United States v. Ratigan*, 351 F.3d 957, 964–65 (9th Cir. 2003). Thus, Edwards' claims generally do not run afoul of this doctrine. *See United States v. Withers*, 638 F.3d 1055, 1066 (9th Cir. 2011) (explaining that a claim of ineffective assistance of counsel is a basis for habeas relief and therefore "need not be raised on direct appeal to preserve it for collateral attack").

Although all of Edwards' habeas claims sound in "ineffective assistance," the government argues that Edwards' "constructive denial" claim "is a thinly

18

disguised attempt to appeal from the district court's December 19, 2017, denial of Edward[s'] third motion for new counsel." (Doc. 419 at 42 (citing Doc. 210).) That argument is persuasive insofar as this Court fully considered the issue of whether counsel should remain on the case and made a definitive pretrial ruling denying Edwards' motion for substitution. (*See* Doc. 210.) That ruling could have been challenged on direct appeal. However, because that ruling was not challenged on direct appeal and Edwards could—and undoubtedly would—argue that was in itself ineffective, Edwards' constructive denial of trial counsel claim is addressed on the merits below.

## III.   Necessity of an Evidentiary Hearing

Although Edwards requests an evidentiary hearing, (Doc. 411 at 25), one need not be held if the issues can be conclusively decided based on the evidence in the record. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977); *see United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998) (explaining that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief"). Here, the habeas record includes not only complete transcripts and sealed correspondence from Edwards during the initial proceedings, but also Edwards' pro se filings on habeas and trial counsel's affidavit wherein counsel responded to inquiries posed by both the government and Edwards. The issues identified below can be

conclusively decided based on that documentary evidence. *See Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990); *United States v. Espinoza*, 866 F.2d 1067, 1070 (9th Cir. 1988). Accordingly, an evidentiary hearing is not necessary.

## IV.    Merits

The Sixth Amendment guarantees the right of effective assistance of counsel at all critical stages of a criminal proceeding. *See United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997). "This right has two components: (1) the right to counsel's undivided loyalty and (2) the right to reasonably competent counsel." *Daniels v. Woodford*, 428 F.3d 1181, 1196 (9th Cir. 2005) (internal citations omitted). Edwards' habeas petition implicates both components.

### A.    Constructive Denial of the Right Counsel

"A defendant has a Sixth Amendment right to conflict-free representation." *Id.* While this does not "guarantee a right to counsel with whom the accused has a meaningful attorney-client relationship[,] . . . where a court compels one charged with a grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in an irreconcilable conflict it deprives him of the effective assistance of any counsel whatsoever." *Id.* (internal quotation marks and alterations omitted). If such conflict is found to exist, no showing of prejudice is required. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984) ("In certain

Sixth Amendment contexts, prejudice is presumed.  Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."); *see also United States v. Velasquez*, 855 F.3d 1021, 1034 (9th Cir. 2017).

As an initial matter, Edwards correctly identifies that two types of conflict can arise between a defendant and counsel in the Sixth Amendment context: a "conflict of interest" and an "irreconcilable conflict."  *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998).  The former regards a lawyer with divided loyalties and is sometimes referred to as a "*Cuyler* claim."  *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  The second type of conflict focuses on the relationship between counsel and the defendant and may be referred to as a "*Frazer* claim." *See Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994).  Here, Edwards' claim falls into the latter category.

Courts determining whether a conflict existed must assess: (1) the extent of any conflict, (2) the adequacy of the district court's inquiry, and (3) the timeliness of the motion.  *See Daniels*, 428 F.3d at 1197–98 (applying the same test as when a trial court considers a motion for substitution of counsel).  Because Edwards cannot show a fundamental breakdown of communication or an insufficient inquiry, his constructive denial claim fails.

### 1.    Extent of the Conflict

21

The Sixth Amendment only guarantees competent representation, not "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983).  Nevertheless, "a defendant is denied his Sixth Amendment right to counsel when he his forced into a trial with the assistance of a particular lawyer with whom he is dissatisfied, with whom he will not cooperate, and with whom he will not, in any manner whatsoever, communicate." *United States v. Nguyen*, 262 F.3d 998, 1003–04 (9th Cir. 2001) (internal quotation marks and alterations omitted).  Here, there is no question that Edwards had a less than ideal relationship with trial counsel.  Nevertheless, the record does not show a complete breakdown of communication.

Edwards filed two motions[7] to substitute Hoovestal.  (*See* Docs. 166, 199.) Edwards filed his first motion on the pretrial motions deadline, explaining that Hoovestal had only met with him once, had generally failed to communicate with him and refused his calls, and had not discussed pretrial motions despite the deadline.  (Doc. 166.)  In response, Hoovestal agreed with Edwards as to the scope of their contact but explained that he had spent substantial time reviewing discovery, which included the drafting of a 46-page advisory opinion letter for Edwards that discussed: "the elements of the offense, the evidence against him, his possible defenses, the sentencing guidelines calculations, and his sentencing

---

[7] This followed two earlier substitutions of counsel.  (*See* Docs. 14, 126, 130.)

exposure if he rejects the plea agreement and goes to trial." (Doc. 170 at 3–4; *see* Doc. 201-4.) In response to the accusation that he had not spent enough time meeting with Edwards, Hoovestal explained: "While I recognize that some hand-holding is necessary, face-to-face meetings are not particularly productive in terms of trial preparation because they amount to a lot of conclusory statements about the prosecution in general that do not tend to be particularly helpful. That is why I directed Mr. Edwards to provide me with his defenses and comments in writing." (Doc. 170 at 5.) And "[t]here has been ample written communication between Mr. Edwards and me to formulate a defense." (*Id.*) A hearing was held on the motion to substitute. At that hearing, Edwards indicated that he and counsel had been able to meet and that he "would just like to continue with Mr. Hoovestal. We've been able to talk yesterday." (Doc. 418 at 3.) Trial was then continued for an additional four months to allow Hoovestal to seek further discovery on Edwards' behalf. (*See* Doc. 188 (hearing transcript).)

Three months later and six weeks before trial, Edwards filed a second pro se motion to substitute Hoovestal. (Doc. 199.) That motion reiterated several of Edwards' previous complaints, including the failure to obtain Edwards' requested discovery and interview witnesses and the failure to respond to Edwards' attempts to contact counsel or meet with Edwards. (*See id.*) Of primary concern to Edwards was counsel's advice regarding what Edwards believed to be a valid

23

suppression issue: Officer Seder drove his vehicle to the police station before obtaining a warrant. (*See id.* at 2–3.) Edwards also filed a complaint with the Office of Disciplinary Counsel against Hoovestal. (*See* Doc. 207 (Hoovestal's response to the ODC complaint).) Hoovestal filed a detailed response, indicating that once again while he had not spent a significant time communicating with Edwards directly, he had spent substantial time reviewing discovery and preparing the case for trial. (*See* Doc. 201 at 2.) He further stated that he warned Edwards that his office would not accept his calls if counsel was unable to talk at that time and that he would not respond to emails sent by third parties because it would obviate the attorney-client privilege. (*See id.* at 3–4.) Hoovestal confirmed that he was prepared for trial and had investigated the issues identified by Edwards, including the suppression issue. (*See id.* at 5–11.) Counsel also submitted an affidavit from his paralegal. (*See* Doc. 204.)

Another substitution hearing was held. (*See* Doc. 226.) At that second hearing, the Court discussed Edwards' complaints, emphasizing that they primarily went to litigation tactics, which "are generally left to counsel." (*Id.* at 6–7.) The Court also noted that Hoovestal's records showed he was well versed in both the case and the law, and that he and Edwards agreed on the fundamental defense theory: "Edwards was attempting to run an escort service, which is not illegal, and that he was not promoting prostitution, and that any prostitution that occurred was

24

done by these women on their own." (*Id.* at 8–9.) Edwards was given the

opportunity to speak. Edwards alleged that Hoovestal "ain't done no research" and

that he disagreed with the trial strategy as it related to the transportation of minors.

(*Id.* at 14–15.) Edwards also alleged that Hoovestal had made no attempt to get

Edwards' phone or certain exculpatory messages or emails. (*Id.* at 15.) According

to Edwards, Hoovestal was "not doing anything beneficial" and that "[t]here's

nothing being done in [his] defense." (*Id.* at 15–16.) Finally, Edwards stated that

they had never sat down and discussed all the charges and that Hoovestal's

representation was "ridiculous" and he felt "like [he] would be better off

representing [him]self." (*Id.* at 16.) When challenged on that point, Edwards once

again stated that Hoovestal "was not prepared." (*Id.*) The Court ultimately denied

Edwards' substitution request, concluding:

> I find that Mr. Edwards is entitled to an effective advocate. Mr.
> Hoovestal has demonstrated to my satisfaction that he will be that for
> Mr. Edwards. I think that Mr. Edwards is generally being unreasonable
> with regard to his complaint and his dissatisfaction with Mr. Hoovestal,
> and that my review of all of these materials convinces me that
> substitution of counsel isn't warranted.

(*Id.* at 16–17.)

Subsequently, Edwards filed numerous pro se motions, seeking, *inter alia*, a

request for a suppression hearing, an evidentiary hearing, an appeal, and an order

requiring the government to disclose evidence from JR's "work" phone, JR's

messages with her friend, and "all Brady and Giglio material that [Edwards] [wa]s

not aware of." (*See* Docs. 225, 239, 240.)  These motions were denied because

Edwards was represented and could therefore only pursue relief through counsel.

(*See* Doc. 243.)  The week before trial, Edwards filed another pro se letter, once

again insisting that he had not received all relevant discovery and that he had not

had sufficient time to review what he had received.  (Doc. 270.)

 During trial, Edwards continued to be critical of Hoovestal's representation.

After the first day of testimony, Edwards insisted on addressing the Court outside

the presence of the jury, indicating that he had three issues with counsel's

performance: (1) he wanted counsel to ask the witnesses if they knew what perjury

was; (2) he believed counsel had not adequately used phone records to impeach

witnesses; and (3) he knew that the government's Rule 404(b) witness, AC, had

recanted in open court and wanted those transcripts presented.  (Tr. 495–96.)  The

next day, Edwards once again addressed the Court, this time insisting that a phone

call was missing from the jail calls that he believed showed that he never spoke to

KS or AS about anything illegal.  (Tr. 749.)  Finally, after the jury was given final

instructions but prior to closing arguments, Edwards raised what he called a *Brady*[8]

issue; i.e., that the government's rebuttal witness, Agent Walter, had stated he

knew nothing about Edwards discussing drugs, as opposed to prostitution, with AS

as a way to make money.  (Tr. 1469.)

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1963).

The above indeed shows that Edwards was often dissatisfied with trial counsel's representation. It does not, however, show a complete breakdown of the attorney client relationship such that trial counsel fundamentally failed to defend Edwards in contravention of the Sixth Amendment. In those cases where prejudice is presumed based on a constructive denial of counsel, courts have repeatedly emphasized that the fundamental problem in those relationships was that trial counsel stopped acting as an advocate for the defendant and was either indifferent to the fate of the defendant or even attempted to sabotage the defendant's chances at trial. *See, e.g.*, *Ellis v. Harrison*, 947 F.3d 555, 556 (9th Cir. 2020) (en banc) (Nguyen, J., concurring) ("Ames was disloyal and entirely indifferent to the fate of his non-white clients, convinced that they were all stupid and deserved to be convicted."); *Javor v. United States*, 724 F.2d 831, 834–35 (9th Cir. 1984) (prejudice presumed where an attorney slept through portion of trial). That is not the case here.

Here, Edwards consistently disagreed with the decisions that defense counsel had a legal right to make. Edwards' regular correspondence with both counsel and this Court show an inflexible view of the case and evidence that prevented him from aiding in his own defense. Although counsel's limited face-to-face contact with Edwards is indeed concerning, the record shows that counsel listened to Edwards but was not heard himself. A defendant's dislike of the advice

27

being provided by counsel is not the same as such a fundamental denial of counsel that presumes prejudice. A complaint that arises out of differences in trial strategy is not an appropriate ground for substituting counsel. *See Schell v. Witek*, 218 F.3d 1017, 1026 n.8 (9th Cir. 2000) (citing *Brookhart v. Janis*, 384 U.S. 1, 8 (1966) (Harlan, J., dissenting) ("[A] lawyer may properly make a tactical determination of how to run trial even in the face of his client's incomprehension or even explicit disapproval.")). The Court specifically confirmed with counsel that he was able to communicate with Edwards in preparation for trial. (*See* Doc. 226 at 13.) Contrary to Edwards' position, neither effective communication nor a trust relationship requires counsel to acquiesce to the demands of the defendant. *See United States v. Adelzo-Gonzalez*, 268 F.3d 772, 779 (9th Cir. 2001) (indicating that a lack of trust between counsel and defendant without a legitimate basis for lack of confidence is not sufficient to justify substitution). Moreover, while Edwards repeatedly stated that Hoovestal had done "nothing" and was not prepared to try the case, those concerns are directly belied by the record as discussed above.

Ultimately, the above-cited transcripts and sealed correspondence establish that Edwards and trial counsel disagreed over how to interpret the law, over trial strategy, and whether there was a valid argument to seek suppression of evidence in the case. More specifically, Edwards wanted trial counsel to take very specific and discrete actions, such as filing very specific motions and asking specific

28

questions of specific witnesses. Counsel often refused to do so. "These are not the types of disputes that jeopardize a defendant's Sixth Amendment right to counsel."[9] *United States v. Williams*, 673 F. App'x 620, 624 (9th Cir. 2016) (citing *United States v. Rogers*, 769 F.2d 1418, 1424 (9th Cir. 1985)). Cases in which courts have found a significant breakdown in the attorney-client relationship have been marked by, for example, "a complete communications breakdown," *Nguyen*, 262 F.3d at 1005, an attorney's "open opposition" that left the defendant "effectively unrepresented," *Adelzo-Gonzalez*, 268 F.3d at 779, and "an atmosphere of mistrust, misgivings and irreconcilable differences," *Moore*, 159 F.3d at 1159. In *Frazer*, for example, the defendant claimed that counsel called him a "stupid nigger son of a bitch and said he hopes [Frazer] gets life. And if [Frazer] continue[d] to insist on going to trial [Frazer] w[ould] find him to be very ineffective." 18 F.3d at 780. The Sixth Amendment defect was fundamental:

> Such behavior completely destroys and negates the channels of open communication needed for the relationship to function as contemplated in the Constitution. It is the client's right to expect that his lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf.

*Id.* at 785 (internal quotation marks omitted). Here, the record shows that trial counsel put all his skills, energy, and resources into defending Edwards. Edwards'

---

[9] Notably, Edwards continues to litigate his case alongside appointed counsel. (*See* Docs. 422, 425, 426.)

disagreement with counsel's decisions and performance does not amount to a constructive denial of his Sixth Amendment right to counsel.

### 2.    Adequacy of the Inquiry

"With respect to the adequacy of the district court's inquiry, the Supreme Court has emphasized that, in most cases, 'courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer.'" *Velazquez*, 855 F.3d at 1034 (quoting *Martel v. Clair*, 565 U.S. 648, 664 (2012)). "[T]he trial court should question the attorney or defendant privately and in depth, and examine available witnesses." *Daniels*, 428 F.3d at 1200 (internal quotation marks omitted).  Fundamentally, the court must attempt to "understand the extent of the breakdown." *Moore*, 159 F.3d at 1160.  While Edwards is correct that the Court cited the rule governing conflict of interest instead of irreconcilable conflicts, (Doc. 266 at 12 (citing *United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003)), the substance of the Court's inquiry properly focused on Edwards' concerns and whether counsel had considered them.  As discussed above, this Court reviewed multiple filings and held two substitution hearings on this matter.  The Court also permitted Edwards to make a pro se record during the trial to ensure that his concerns were being addressed.  As such, the inquiry into Edwards' relationship with defense counsel was adequate.

### 3.    Timeliness

Finally, if there had been a fundamental conflict, Edwards' requests were timely insofar as both were filed in advance of trial. The Court also consistently found that Edwards' requests were not made in an attempt to delay matters. (*See* Doc. 188 at 35.) This factor alone, however, is insufficient to warrant relief.

## B.     Ineffective Assistance[10]

To prevail on an ineffective assistance of counsel claim, a petition must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 687–88. That is, the petition must show not only that there was a deficiency, but that the deficiency was prejudicial. *Id.* at 692. "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To wit, the Supreme Court has cautioned that "[a] fair assessment of attorney performance requires that

---

[10] Although several of Edwards' challenges were not fully briefed, (*see* Doc. 410 at 8–9; Doc. 411 at 31–32), they have been fully considered on the merits here.

every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Here, Edwards alleges counsel was ineffective on the nine grounds listed above. His claims lack merit as discussed below.

### 1. Waiver of Preliminary Hearing

Edwards first argues that his initial defense attorney, Steven Babcock, was ineffective for waiving his preliminary hearing without his consent. Indeed, the minute entry for Edwards' initial appearance and arraignment indicates the preliminary hearing was waived, (*see* Doc. 3); however, that waiver was neither objectively unreasonable nor prejudicial.

"Although the right to a preliminary examination is embodied in the United States Code and the Rules of Criminal Procedure, the right is not constitutional." *United States v. Aranda-Hernandez*, 95 F.3d 977, 979 (10th Cir. 1996). A preliminary hearing "is not a minitrial of the issue of guilt," rather "its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Coleman v. Burnett*, 477 F.2d 1187, 1201 (D.C. Cir. 1973); 18 U.S.C. § 3060(a); Fed. R. Crim. P. 5.1(a). Consistently, hearsay evidence is allowed and the rules of evidence generally do not apply. *See United States v. Tuell*, 2024 WL 1333045, at \*1 (N.D. Okl. Mar. 27, 2024) (describing the rules

32

governing such hearings as "focused on practicality and flexibility"); Fed. R. Evid.

1101(d)(3).  Additionally, a defendant's rights in such a hearing are limited; while

he may cross-examine witnesses and introduce evidence, he may not force the

government to call specific witnesses, *see Tuell*, 2024 WL 1333034, at *2

(explaining that, like at a grand jury proceeding, "a defendant has no right . . . to

demand that the Government present specific witnesses"), and he "may not object

to evidence on the ground that it was unlawfully acquired," Fed. R. Crim. P. 5.1(e).

As discussed below, Edwards' challenges to the government's probable

cause showing focus primarily on his contention that JR was lying to investigators

and that investigators unlawfully used his initial detention to discover further

evidence against him.  Neither belief would have been vindicated through a

preliminary hearing.  Edwards would not have been able to challenge the legality

of the investigators' actions, Fed. R. Crim. P. 5.1(e), and the government could

have simply called the law enforcement officers themselves to testify to what JR

told them, *see Peterson v. California*, 604 F.3d 1166, 1169–70 (9th Cir. 2010)

(explaining that the defendant "was entitled to confront witnesses against him at

trial . . . [but] not constitutionally entitled to confront them at his preliminary

hearing").

But even if the hearing had taken place and the magistrate judge found

probable cause lacking and so dismissed the complaint, the grand jury could still

have indicted Edwards, *see* Fed. R. Crim. P. 5.1(f); 18 U.S.C. § 3060(e), and he

would simply have been rearrested, *see* 18 U.S.C. § 3060(d), (e). Consequently,

Edwards cannot show prejudice. This claim therefore fails.

### 2. Edwards' Vehicle

A consistent theme throughout Edwards' pro se communications is the belief

that trial counsel should have filed a motion to suppress the evidence seized from

his vehicle on the basis that Officer Seder entered the vehicle and drove it to the

police station before obtaining a warrant. Trial counsel refused to do so on the

ground that the existence of probable cause alone, even in the absence of exigent

circumstances, justifies the warrantless search and seizure of an automobile, citing

first *Chambers v. Maroney*, 399 U.S. 42 (1970), and then *United States v. Bagley*,

772 F.2d 482 (9th Cir. 1985). Because trial counsel was right, Edwards' claim

fails under both prongs of *Strickland*.

Edwards argues that trial counsel's performance was deficient because he

failed to challenge law enforcement's seizure of Edwards' vehicle in the absence

of exigent circumstances. Indeed, *Chambers* states that "[o]nly in exigent

circumstances will the judgment of the police as to probable cause serve as a

sufficient authorization for a search." 399 U.S. at 51. However, in a later decision,

the Supreme Court clarified that a lawfully parked but fully mobile vehicle could

be searched without a warrant in light of its inherent mobility and the reduced

34

expectation of privacy in a registered vehicle on a public road. *See California v. Carney*, 471 U.S. 386, 392–93 (1985). Relying on *Carney*, not *Chambers*, the Ninth Circuit subsequently held in *Bagley* that "the existence of probable cause alone justifies a warrantless search or seizure of a vehicle lawfully parked in a public place." 772 F.2d at 491. Here, Edwards' argument is premised on the idea that *Bagley* is incorrect. Edwards' argument therefore fails under *Strickland* because *Bagley*, correct or not, is the law in the Ninth Circuit. Edwards appears to recognize this fact, as he relies on an Eleventh Circuit case to argue that the Ninth Circuit got it wrong. *See United States v. Alexander*, 835 F.2d 1406, 1410 (11th Cir. 1988) (explaining why exigency is required in the Eleventh Circuit, contrary to the Ninth Circuit's *Bagley* decision). Because existing law provided no reasonable basis to challenge law enforcement's warrantless seizure of Edwards' car, he has not demonstrated that counsel's refusal to pursue suppression on this ground fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *cf. Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (explaining that counsel "cannot be required to anticipate" a later court decision).

Even if exigency were required, however, Edwards cannot show prejudice arising out of law enforcement's warrantless seizure for several reasons. First, the government may have been able to establish exigency since Edwards did not own the vehicle, (*see* Tr. 906), and its registered owner could come and move it at any

time. *See Bagley*, 772 F.2d at 491 (finding exigency in that arrestee was not registered owner). Second, and more importantly, a search warrant was obtained before the vehicle was fully searched, (Tr. 906), and much of the evidence was recovered, (Tr. 478 (Ex. 55, laptop); Tr. 908 (condoms); Tr. 909 (books); Tr. 909–10 (receipts).) *See Bagley*, 772 F.2d at 491 ("The items were secured during a search conducted pursuant to a warrant. Towing the automobile to the police storage lot for safekeeping in no way contributed to the subsequent search. The search warrant was based on information wholly independent of the automobile seizure."). As a result, even if counsel should have sought suppression, it would not have extended to the primary evidence against Edwards. *Strickland*, 466 U.S. at 692. Third, even if the information seized from the vehicle had been suppressed, "there remained ample other evidence," including phone records, that linked Edwards to the alleged conduct. *See Doganiere*, 914 F.2d at 168. Edwards' first claim fails.[11]

### 3.    Edwards' Seizure and Statements

Edwards further argues that counsel was ineffective for failing to file a suppression motion on the ground that law enforcement lacked probable cause to seize him at the hotel and that, as a result of illegally detaining him, officers

---

[11] Edwards also insists that counsel was ineffective for failing to raise this issue with Officer Seder on cross-examination at trial. However, it is unclear how this line of questioning would benefit Edwards.

obtained additional evidence against him, such as his statements, car keys, room key, and phone. This claim also lacks merit.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). Probable cause is found when the facts and circumstances within an officer's knowledge are sufficient to cause a reasonable person to believe that the suspect has committed an offense. *United States v. Smith*, 802 F.2d 1119, 1123 (9th Cir. 1986). The facts supporting probable cause must be known at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Here, there appears to be little dispute that Edwards was "detained" as soon as law enforcement approached him and "arrested" very shortly thereafter. (*See* Tr. 1367 (Edwards testifying that he told Officer Seder he wanted to leave and Officer Seder said he was being detained).) However, that seizure was lawful because it was supported by probable cause.

At the time of his arrest, officers had already spoken to JR, who told them that Edwards was forcing her to engage in prostitution. (*See* Tr. 469; Doc. 1.) The officers were able to preliminarily verify JR's statements by reviewing a Backpage.com advertisement and the contents of JR's "work" phone, which included text messages with Edwards referencing commercial sex work. (*See* Tr. 470–71, 898; Ex. 54; Ex. 17; Doc. 1.) JR also told officers that Edwards had gone to North Dakota to pick up additional girls to work as prostitutes, and three

underage girls were found in a room rented under Edwards' name at the hotel.[12]
(Doc. 1.)  Edwards also attempted to break his cell phone when officers
approached him.  (*Id.*)  Based on the foregoing, officers had probable cause to
arrest Edwards on suspicion of promoting prostitution in violation of Montana
Code Annotated § 45–5–602.[13]

Given his lawful arrest, officers had the authority to search Edwards' person
to discover any weapons or other evidence. *United States v. Robinson*, 414 U.S.
218, 235 (1973) ("[A] custodial arrest of a suspect based on probable cause is a
reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a
search incident to the arrest requires no additional justification.").  Thus, the
seizure of his Montana identification, broken phone, car keys, and motel key was
also lawful, (*see* Tr. 473), and counsel's failure to challenge their seizure was not
objectively unreasonable.  And even if that were not the case, Edwards cannot
show prejudice because investigators could have accessed the room without

---

[12] Edwards appears to disagree with the timing here, arguing he was arrested before
it was established that the girls were underage.  (*See* Doc. 225 at 5.)
[13] A federal arrest warrant was issued by a magistrate judge two days later.  (*See*
Doc. 2.)  Edwards consistently argues that he was unlawfully seized so that
investigators could gather more evidence against him so that he could be charged.
(*See, e.g.*, Doc. 400 at 11.)  That argument lacks merit as the contents of the
Complaint show that it was based on the same facts known to investigators at the
time he was arrested on September 21.  (*See* Doc. 1.)

Edwards' key card, (*see* Tr. 896),[14] and warrants were obtained to search the

vehicle, (Tr. 478; *see* Doc. 201-5), and Edwards' cell phone, (Tr. 474).

Edwards also made limited statements to law enforcement prior to being

*Mirandized*.[15]  Specifically, Edwards told law enforcement that he had rented a

room in the motel and that he had broken his phone earlier because he was

frustrated about something.  (Tr. 916–17.)  Edwards declined to give a statement.[16]

(Tr. 476.)  Even if these two statements were improperly admitted in the

government's case-in-chief at trial, *see United States v. Gomez*, 725 F.3d 1121,

1125–26 (9th Cir. 2013) (explaining that un-*Mirandized* voluntary statements must

be excluded from the prosecutor's case but may be used as impeachment

evidence), Edwards failed to show their admission "actually had an adverse effect

on the defense," *Strickland*, 466 U.S. at 693.  As it relates to the hotel room, the

government presented evidence that law enforcement was told Edwards had rented

a room by hotel management.  (Tr. 473.)  In regard to the cell phone, Edwards'

statement provided an alternative reason for its destruction than the one presented

by the government; i.e., its destruction was unrelated to the phone's impending

---

[14] Notably, in one of his filings, Edwards indicates that the motel key card was provided by hotel staff, not taken off his person.  (*See* Doc. 400 at 7.)
[15] *See Miranda v. Arizona*, 384 U.S. 436 (1966).
[16] On the way to the jail, Edwards indicated that he wanted to speak to Officer Seder.  (Tr. 476.)  Edwards was *Mirandized* but only told Seder that the phone they seized at the hotel was "maybe" his before requesting an attorney.  (Tr. 476–77.)

seizure. While the admission of this statement may have undermined Edwards'
credibility insofar as the government could prove that the phone was used just
before it was seized, (Tr. 917), it is not reasonably probable that the outcome of
trial would have been different in the absence of this limited statement. *Strickland*,
466 U.S. at 694.

Based on the foregoing, Edwards' claims related to his seizure and
statements also fail under *Strickland*.

### 4. *Franks* Hearing

Edwards argues that trial counsel was ineffective for failing to challenge the
search warrant for his vehicle by requesting a hearing under *Franks v. Delaware*,
438 U.S. 154 (1978). (*See* Doc. 400 at 9.) To prove a violation under *Franks*, a
defendant must show by a preponderance of the evidence that (1) the government
intentionally or recklessly made false or misleading statements or omissions in its
warrant application and (2) these false or misleading statements or omissions were
necessary to a finding of probable cause. *See United States v. Perkins*, 850 F.3d
1109, 1116, 1119 (9th Cir. 2017). If both requirements are met, "the search
warrant must be voided and the fruits of the search excluded." *Franks*, 438 U.S. at
156. That is not the case here.

"Under the first step of *Franks*, the defendant must show by a preponderance
of the evidence that the affiant knowingly and intelligently, or with reckless

40

disregard for the truth, made false or misleading statements or omissions in support of the warrant application." *Perkins*, 850 F.3d at 1116. "An officer presenting a search warrant application has a duty to provide, in good faith, all relevant information to the magistrate." *Id.* "A negligent or innocent mistake does not warrant suppression." *Id.* "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).

Here, Edwards' pro se filings allege the following information was wrongfully omitted from that warrant application:

(1)  Officer Seder unlocked, accessed, and drove Edwards' vehicle from the hotel to the police station;

(2)  JR spoke to her mother and the Lake County Sheriff's Officer on September 12 and told them that she went somewhere for work and was fine;

(3)  JR told Officer Seder during her interview that she had spoken to her mother numerous times while with Edwards;

(4)  JR messaged friends and family daily while with Edwards;

(5)  the minor girls told law enforcement that they had never discussed prostitution with Edwards and had all lied to Edwards about their ages;

(6)  AT denied being trafficked; and

41

(7)  none of the Backpage.com advertisements offered sex. (*See* Doc. 400 at 13; Doc. 225 at 6–8 (sealed pro se letter).)  Edwards further argues that Officer Seder lied (8) about having found texts at the time they interviewed JR showing that she communicated with Edwards about prostitution and (9) when he said that Edwards purposely broke his phone in half.  (*Id.*)

As it relates to (8) and (9), the record does not support Edwards' contention that this information was false.  JR's "work" phone did contain messages indicative of commercial sex work being exchanged with a person she identified as Edwards.  (*See* Ex. 555.)  And while Edwards insists his phone was broken before he interacted with law enforcement, phone records belie that assertion.  (*See* Tr. 917 (reflecting the phone was used moments before its seizure).)  At best then, the warrant application omits the fact that Edwards told Agent Walter that he broke the phone earlier.  The warrant application did not contain "false" information as alleged by Edwards.

Edwards is correct that the information identified in (1) through (7) is not in the search warrant application.  (*See* Doc. 201-5 at 5–20.)  But even assuming this information was improperly and intentionally omitted, it was not material to the warrant application.  Under the second step of *Franks*, the "key inquiry is whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions." *Perkins*, 850 F.3d at 1119 (internal

quotation marks omitted). Regarding (1), the fact that Officer Seder is the one that

drove the vehicle to the police station does not bear on whether there was sufficient

evidence to support a search warrant of that vehicle. As discussed above, Officer

Seder's occupancy was legal and, even if it was not, the warrant application did not

contain any evidence Seder found in the vehicle.

While the remaining information identified in (2) through (7) more directly

bears on the evidence in the case, it would not have changed the probable cause

conclusion either. The information identified as (2) through (4) regards JR and

arguably undermines her assertion to law enforcement that she had been held

against her will. But even if this information was included in the warrant

application, it does not definitively show her consent. To the contrary, the warrant

application indicates that "pimps" often exert significant control over prostitutes

through a culture of fear, (Doc. 201-5 at 9), and that JR was indeed afraid of

Edwards, (*id.* at 12). Nor do the minor girls' statements to law enforcement

identified in (5) obviate the fact that they were in fact underage and that at least

one of them told investigators that she believed she was being brought to Montana

to engage in sex in exchange for money. (*See id.* at 15.) Neither the minors'

consent nor a defendant's lack of knowledge as to their ages is a defense to a

charge under 18 U.S.C. § 2423(a). (*See* Tr. 1455 (Final Jury Instrs. 59, 60).)

Similarly, while AT may have denied being trafficked, JR told investigators that

Edwards traveled to Washington and brought AT back to Montana to engage in commercial sex. (Tr. 612–13.) That is a sufficient factual basis to believe that evidence of such an offense would be found in the vehicle used to transport AT even if AT consented to the travel. *See Perkins*, 850 F.3d at 1119 ("Probable cause to search a location exits if, based on the totality of the circumstances, there is a fair probability that evidence of a crime may be found there." (Internal quotation marks omitted.)). Notably, consent is not an element of the offense of transportation of a person with the intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2421. (*See* Tr. 1462 (final instructions).)

Finally, regarding the content of the Backpage.com advertisements, the application states: "[JR] was advertised as being available for sexual services at that time and the pictures used were the one[s] taken with the lingerie Edwards had purchased." (Doc. 201-5 at 11.) While the warrant application did not state that the advertisements did not explicitly offer sex, it did state that "vague descriptions" are often used to "prevent detection of law enforcement." (*Id.* at 9.) Thus, even if the application noted the absence of explicit language, it provided sufficient information to infer that such omissions are themselves inculpatory.

Based on the foregoing, probable cause would lie with the search warrant at issue even if the warrant application contained the information identified by Edwards. As such, Edwards has not demonstrated that counsel's failure to request

44

a *Franks* hearing fell "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, or that he was prejudiced by the decision, *id.* at 692.

###    5.    Edwards' Trial Testimony

Edwards further argues that trial counsel was ineffective for failing to consult with him regarding his Fifth Amendment right to testify and, relatedly, failing to prepare him to do so.  According to Edwards, his "testimony only harmed the case, and he should have chosen to remain silent." (Doc. 411 at 30.) Alternatively, "to the extent his testimony could have helped the case, he was not properly prepared . . . due to his inability to communicate with counsel." (*Id.*) This claim is belied by the record.

As indicated in an early memorandum, the defense theory of the case was that Edwards was operating a legal escort service that the alleged victims participated in voluntarily and that any sexual acts that occurred were the decision of the victims themselves. (*See* Doc. 201-2; Doc. 421 at ¶ 4.)  Consistently, Edwards insisted that the government's "witnesses were all lying, and so it was necessary for him to testify to refute the allegations made by each of the women that he forced them into prostitution." (Doc. 421 at ¶¶ 1, 4.)  And, according to defense counsel, he "spoke at length [with Edwards] about his direct examination as well as cross-examination," including on the day before Edwards testified. (*Id.*

¶¶ 5–6, 12.)  Defense counsel has further stated that he "did not pressure [Edwards] to do anything" and that Edwards planned to testify from the start.  (*Id.* ¶ 6; Doc. 266 at 3; Tr. 5.)  Indeed, Edwards' numerous pro se filings reflect a consistent desire to be actively involved in his defense and tell his version of the story.  (*See, e.g.*, Doc. 206, 225, 239, 240, 270.)  Absent from the record, however, is any indication that Edwards could be cowed, coerced, or compelled to do anything he did not want to.

Edwards further argues that it was ineffective for defense counsel to announce prior to trial that he would testify, both foregoing Edwards' choice in the matter and allowing the government to present harmful hearsay testimony that would otherwise be inadmissible.  Indeed, prior to trial, defense counsel informed the prosecution and the Court that Edwards intended to testify.  (*See* Doc. 266.)  However, as a "strategic choice[] made after thorough investigation of law and facts relevant to plausible options," that decision is "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  In its trial brief, the government noticed its intent to use Edwards' inculpatory statements at trial under the party opponent rule, *see* Fed. R. Evid. 801(d)(2)(A).  (Doc. 256 at 32.)  The government further indicated, however, that Edwards could not seek to introduce his own "statements (exculpatory or otherwise) through other witnesses or documents" as to do so would contravene the rules excluding hearsay.  (*Id.* at 32–35.)  Accordingly, the

government argued that "unless Edwards . . . elects to testify, he . . . should not be permitted to elicit testimony of his statements from witnesses or other evidence." (*Id.* at 35.)  As a result, whether Edwards would testify was dispositive of whether defense counsel would be permitted to ask witnesses certain questions during the government's case-in-chief.  Thus, the decision to announce Edwards' intent to testify was a strategic one that fell to defense counsel, *Strickland*, 466 U.S. at 681, even if the "ultimate decision whether to testify rest[ed] with the defendant," *see United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) ("Because the right [to testify] is personal, it may be relinquished only by the defendant.").

Edwards' argument that testifying opened him up to harmful hearsay evidence is no more compelling.  As an initial matter, Edwards does not identify the specific evidence at issue.  Moreover, while the government would not have been able to cross examine Edwards had he not testified, all of Edwards' statements to other witnesses were admissible under the party opponent rule whether he testified or not.  *See* Fed. R. Evid. 801(d)(2)(A).  Accordingly, while the decision to testify opened Edwards to certain risks, this was not one of them.

Based on the foregoing, Edwards fails to show that trial counsel's actions in this regard fell "outside the wide range of professionally competent assistance."[17] *Strickland*, 466 U.S. at 690.

---

[17] Notably, defense counsel planned to call an additional defense witness, Trista

### 6.    Impeachment Evidence

Another consistent argument throughout Edwards' pro se filings is that trial counsel did not adequately impeach the testimony of the government witnesses at trial. Specifically, Edwards argues that counsel could have used statements made during their initial police interviews[18] and presented other text message interactions to show they were lying on the stand. This claim also fails under both prongs of *Strickland*.

As it relates to trial counsel's performance, "[b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 486 U.S. at 681. There are several strategic reasons to not use certain impeachment evidence at trial. First, as emphasized by the government, cross-examining the victim of a sex crime is "fraught with peril." (Doc. 419 at 31 (quoting *Bunker v. Boe*, 2018

---

Herk, to testify to Edwards' efforts to launch a legitimate escort service website. (*See* Ex. 510.) Herk was precluded from testifying, however, because Edwards violated Federal Rule of Evidence 615 and spoke with her almost every night of trial. (*See* Tr. 1238–47.) Edwards also admitted at sentencing to having had out-of-court contact with the government's Rule 404(b) witness, AC. (*See* Doc. 358 at 30.)

[18] Edwards also argues that it was ineffective to fail to get these interviews admitted into the record. (*See* Doc. 403 at 15.) The interviews themselves, however, would be inadmissible hearsay. *See* Fed. R. Evid. 801. While it is permissible to impeach a witness with a prior inconsistent unsworn statement, *see* Fed. R. Evid. 613, the statement itself is generally not admitted into evidence.

WL 6579047, at *8 (W.D. Wash. Sept. 12, 2018)).)  In this case, for example, defense counsel asked JR to read all her messages to potential clients that were found on the "work" phone.  (*See* Tr. 662; Ex. 555.)  JR refused to do so, stating "This is incredibly uncomfortable, like - - this was a really messed up time in my life.  Like, I don't want to like sit here and go through business.  This is ridiculous."  (Tr. 662–63.)  And when defense counsel asked the Court to direct JR to read the messages, the Court declined, instead allowing counsel to read them. (*See* Tr. 663–64.)  This colloquy emphasizes that trial counsel had to be careful how he handled the victim witnesses in this case.  Second, Edwards was able to impeach witness testimony through his own testimony.  This approach had the added benefit of not allowing the witnesses to further explain away the inconsistencies or state that they lied because they were afraid of Edwards.

Fundamentally, this is not the case where the record indicates defense counsel was not aware of the relevant information or failed to adequately investigate it.  For example, an early letter from trial counsel to Edwards specifically notes that JR made numerous inconsistent statements to law enforcement and her friends and family about where she was, how she was, and what she was doing.  (*See* Doc. 201-2 at 4; *see also id.* at 10 (indicating counsel knew SE did not initially want to talk to investigators because of her own potential culpability).)  And, in his affidavit, trial counsel indicates that much of the text

message evidence in fact corroborated the government's case. (*See, e.g.*, Doc. 421 at 15–16.) As stated by trial counsel, "[i]t might be possible to impeach one or two witnesses' credibility with cross-examination that they were supposed to be escorting and whatever happened in the hotel rooms was all up to them, but when another eight or so witnesses testify to the same pattern of conduct, that defense becomes less effective." (*Id.* at 19–20.)

The purposefulness of counsel's actions is only made clearer when one considers the impeachment evidence he did in fact raise with witnesses. For example, regarding JR, trial counsel emphasized a message she sent to Edwards wherein she asked if he could make her Backpage.com advertisement stand out more because business was slow. (Tr. 670.) Counsel also brought up the fact that a later message to Edwards from JR indicated she was mad at him not because of how he treated her, but because he left her alone with AT and "that bitch almost died in that room with me." (Tr. 678.) He also introduced a communication with a potential client where JR told the client that she was "independent," meaning that she did not have a pimp. (Tr. 686–87.)

Ultimately, the relevant inquiry under *Strickland* is whether defense counsel made an informed decision about how to approach a witness based on a reasonable investigation. The record shows that trial counsel here was aware of all the

evidence in the case and chose not to present certain evidence for strategic reasons. That decision was not objectively unreasonable.

As it relates to prejudice, Edwards fails to identify the specific impeachment evidence at issue. Based on a review of the trial record, however, it appears that Edwards' communications with the witnesses portrayed, at best, mixed feelings about their relationship with Edwards and the conduct they were engaged in. Such evidence is not sufficient to show that "the proceedings would have been different" had it been presented. *Strickland*, 466 U.S. at 687–88.

### 7.    Rule 404(b) Witness–AC

Edwards makes an independent claim regarding AC, the woman he was convicted of prostituting in 2010. According to Edwards, trial counsel was ineffective for failing to obtain and then use transcripts from a hearing related to the 2010 conviction wherein AC testified that Edwards was not involved in her prostitution activities. (*See* Doc. 403 at 16.) Although Edwards indicates that he provided these transcripts to trial counsel, (*see id.*), trial counsel's affidavit indicates that he attempted to obtain the transcripts and was told they did not exist, (*see* Doc. 421 at 13). Assuming that counsel failed to get the transcripts and they are consistent with Edwards' recollection, this argument still fails the prejudice test. As stated by trial counsel, there was no question than Edwards pled guilty to prostituting AC and that judgment was admitted as an exhibit at trial. (*See* Tr. 461,

1125; Ex. 57.)  To the extent Edwards sought to undermine that conviction after the fact, trial counsel cross-examined AC as to who made the choices once she and the "client" were in the hotel room, (Tr. 465), and Edwards testified about his involvement, (Tr. 1125–27).  Thus, Edwards was able to question her credibility without her being able to explain why she might have understated his involvement at the time; i.e., AC's testimony fit the pattern of a woman that thought Edwards was interested in her romantically that then felt compelled to do what he said out of fear, including engaging in sexual activity for money.  (*See* Tr. 464–65.)

### 8.    Failure to Call a Specific Witness

Edwards argues that trial counsel was ineffective for failing to call Anthony Schaffer,[19] JR's-"husband", as a witness for the defense.  According to Edwards, Schaffer had contacted the FBI and "told them that [JR] was lying about being forced to prostitute.  He relayed text and phone conversations he had with her while she was with Edwards, in which she bragged about making money through 'selling pussy and selling dope.'"  (Doc. 403 at 18.)  Trial counsel appears to have agreed that Schaffer's testimony would be relevant and sought a subpoena for Schaffer on the following facts:

> On 09/13/2016, Schaffer received a text from [JR]'s phone number . . . that stated, "Sorry if the missing person notice scared you.  I'm OK. I'm safe.  Don't try to contact me.  Just know I'm OK."  Schaffer responded that he needed to hear her voice.  [JR] called Schaffer about

---

[19] This name is spelled both Schaffer and Schaeffer throughout the record.

one hour later and told him she was in a house with other girls and a man named Terrance or Terrell. Schaffer told [JR] she needed to go back home. [JR] told him she would be gone for a bit and be back home. She just needed to make some money. Schaffer found out through an unknown source that on the day [JR] left town, she dropped off her child to . . . a friend of theirs. Schaffer also spoke with . . . a friend of [JR]'s[] who works at McDonald's in Polson, Montana. [That friend] told Schaffer that [JR] tried to convince her to leave town with her to be a prostitute and sell drugs. [JR] denied to Schaffer that she ran away to become a prostitute.

(Doc. 235 at 5 (sealed subpoena request).) While that subpoena was issued, (*see* Doc. 241-1 at 7–8), trial counsel indicates that he "utilized the Lake County Sheriff's Department Civil Bureau for service of process . . . but they were not able to locate [Schaffer]." (Doc. 421 at ¶ 14(f).) As a result, Schaffer did not testify at trial.

Trial counsel was not ineffective. Trial counsel affirmatively sought a subpoena to have Schaffer testify at trial. And, when he could not be located, counsel used his cross-examination of JR to present the most important parts of Schaffer's putative testimony:

| COUNSEL: | [About September 13 or 14] were you contacted by . . . Schaeffer, your ex-husband, inquiring where you were. |
|---|---|
| JR: | I don't remember. I had called him when I was with [Edwards], though. |
| COUNSEL: | When you were where? |

53

| JR: | When I was with [Edwards], I had called [Schaeffer], I know that. But I don't remember if he contacted me. |
| COUNSEL: | Did you tell . . . Schaeffer that you were safe, that you were okay? |
| JR: | I think so. |

(Tr. 646.)  While defense counsel did not ask JR about her potential recruitment efforts during this exchange, it is not clear such hearsay evidence could have been admitted through Schaffer as a defendant does not have an "unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).  Accordingly, this claim also fails.

### 9.   Direct Appeal

Edwards makes two ineffective assistance of counsel claims based on appellate counsel's performance: (1) refusing to raise ineffective assistance of trial counsel on direct appeal and (2) failing to challenge the sufficiency of the evidence underlying Edwards' convictions for transporting minors in violation of 18 U.S.C. § 2423(a).  Neither claim has merit.

As to Edwards' first argument, "[c]laims of ineffective assistance of counsel are generally inappropriate on direct appeal." *United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000).  The proper avenue for raising such claims is habeas. *Id.* There are only two exceptions: "(1) when the record on appeal is sufficiently developed to permit review and determination of the issue, or (2) when the legal

representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Id.* (quotation marks omitted). Neither is the case here. Further information was needed to resolve Edwards' challenges to trial counsel's performance, (*see* Doc. 421 (Hoovestal Aff.)), and, as discussed above, none of the actions of trial counsel fell below an objective level of reasonableness. There was no "obvious" denial of Edwards' Sixth Amendment right. Accordingly, it would have been inappropriate for appellate counsel to raise ineffective assistance claims on direct appeal.

Edwards further insists that appellate counsel should have appealed the sufficiency of the evidence underlying his transportation of minors convictions under 18 U.S.C. § 2423(a) (Counts 3, 4, and 5).[20] Because a review of the evidence presented at trial shows there was sufficient evidence to support each element of those charges, this claim lacks merit. "Evidence supporting a conviction is sufficient if, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Virgen-Mendoza*, 91 F.4th 1033, 1041 (9th Cir. 2024) (internal quotation marks omitted). For Edwards to be found guilty under § 2423(a), the government was required to prove: (1) he

---

[20] Because this argument was made in Edwards' reply brief, (*see* Doc. 424 at 4–6), the government did not have the opportunity to respond.

knowingly transported KS, AS, and DR between states (2) with the intent to have

them engage in prostitution and (3) that KS, AS, and DR were under the age of 18

years at the time. (*See* Tr. 1452–55 (final jury instructions).)  Because a minor

cannot consent to being sexually exploited, consent by KS, AS, or DR is not a

defense. (*See* Tr. 1455.)  Edwards' knowledge of their ages is also irrelevant to a

finding of guilt. (*See* Tr. 1455.)  However, "the purpose of travel must be, in part,

to have the [KS, AS, or DR] engage in prostitution, but that does not need to be the

only purpose." (Tr. 1456.)  The trial evidence is discussed below.

### a.     Count 4: AS

In 2016, AS was a fifteen-year-old girl living in Fargo, North Dakota.  (Tr.

762.)  Edwards began messaging her online in August 2016, (Tr. 763), and they

eventually agreed that Edwards would come pick her up in mid-September, (*see*

Exs. 32A, 32B).  When AS asks Edwards what the plan was, he replied "[w]e jus

gon get the paper, baby.  No more or less." (*Id.*)  In another message, Edwards

told AS that he was "the nigga that's gon show how to ball on thm hoes." (Ex.

547.)  AS testified that "paper" means "money," (Tr. 765), and that even though he

never specifically used the term, (Tr. 770), Edwards was referring to AS

prostituting herself, (Tr. 767, 770).  Later, AS messaged Edwards about having KS

come with her, and Edwards asked her what KS's "mission" was. (Tr. 773; Ex.

135.)  AS responded, "[t]o make money," which AS once again understood to

mean engaging in prostitution. (Tr. 773; Ex. 135.) Edwards responded by telling
AS, "If she 18 & w the business, she can ride." (Tr. 774; Ex. 135.) Edwards also
told AS not to worry about packing clothes as he would get her some "since u gon
put in sum work." (Tr. 774; Ex. 135.) AS's interactions with KS further support
the government's case. AS knew that KS had previously engaged in prostitution,
(Tr. 775), and before they left, KS told Edwards that she warned AS that "this aint
a game," (Exs. 35A, 35B). And during their stop at a gas station on their way to
Montana, KS asked AS in the bathroom if she was "ready." (Tr. 777.)

### b.    Count 3: KS

KS, AS's friend from high school, was 17 years old at the time. (Tr. 719.)
She testified that AS met someone online and that he "wanted to come pick us up
and make some money in Montana." (Tr. 720.) KS testified that she had
previously engaged in commercial sex work and that she knew they were going to
exchange sex for money. (Tr. 720.) KS also had direct contact with Edwards,
indicating that she would not go without AS but that she was "tryna get this
money." (Exs. 34A, 34B.) Edwards also reassured her that she could travel
without AS as he was not "tryna to do shit but get some paper." (Exs. 35A, 35B.)
KS responded that she wanted to go with him because "[t]his aint [her] first time"
and that she warned AS that "she needs to make sure she ready cause this aint a

57

game." (Exs. 35A, 35B; *see also* Tr. 727 (indicating she wanted to "make sure [AS] knew what she was getting herself into").)

### c.   Count 5: DR

To Edwards' point, the government's case regarding DR is by far the weakest. DR was 16 years old in September 2016. (Tr. 796.) DR had no prior communications with Edwards and only met him that night when she got in his car to come to Montana. (Tr. 798–99, 801.) Nevertheless, when AS, KS, and DR went to get in Edwards' car, AS overheard DR ask Edwards if she could come and Edwards said, "Yeah, if you're down to make money." (Tr. 777.) AS testified that she understood this to mean prostitution. (Tr. 777.) Although DR later testified that she did not really know the reason for the trip, (Tr. 799), and was surprised to learn from investigators that it was to engage in prostitution, (Tr. 802, 805), it is Edwards' intent, not DR's, that matters. Edwards' question to DR, when considered in the context of why Edwards was picking up AS and KS, is sufficient to support the jury's verdict.

### d.   Conclusion

While Edwards is correct that there is evidence he intended to have the girls model purses, (Tr. 753–54, 757–58, 779–80; Ex. 556[21]), or deal drugs, (Tr. 775,

---

[21] Although the trial record indicates this Facebook conversation is contained in Exhibit 556, that exhibit is not included in the filed exhibits or on Edwards' exhibit list. (*See* Docs. 294, 294-2, 294-6, 294-7.)

Ex. 33A; Ex. 547), the trial record must be viewed in the light most favorable to

the government. *Virgen-Mendoza*, 91 F.4th at 1041.  Even though there are not

communications that explicitly state Edwards' intent to prostitute AS, KS, or DR

once they arrived in Montana, that intent can be discerned from the circumstantial

evidence.  More importantly, however, the trip could have more than one purpose

and still run afoul of 18 U.S.C. § 2423(a).  (Tr. 1456.)  Because the trial record

supports Edwards' conviction for Counts 3, 4, and 5, appellate counsel's failure to

raise this issue on appeal was neither unreasonable nor prejudicial.

### 10.   Cumulative Error

Finally, Edwards argues that even if one of the issues addressed above is not

sufficient to warrant habeas relief, the cumulative effects of the errors is.  This

argument is unpersuasive given the absence of error as discussed above.

## IV.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it

enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2255

Proceedings.  A COA should issue as to those claims on which the petitioner

makes "a substantial showing of the denial of a constitutional right."  28 U.S.C.

§ 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the

district court's resolution of [the] constitutional claims" or "conclude the issues

presented are adequate to deserve encouragement to proceed further."  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).  Edwards' claims fail because counsel's performance neither fell below an

objective standard of reasonableness nor caused prejudice.  The § 2255 motion

involves no open questions of law and no close factual questions.  A COA is not

warranted.

CONCLUSION

Based on the foregoing, IT IS ORDERED:

1.  Edwards' motion to vacate, set aside, or correct his sentence under 28

U.S.C. § 2255 (Docs. 400, 403, 410) is DENIED.

2.  A certificate of appealability is DENIED.  The clerk shall immediately

process the appeal if Edwards files a Notice of Appeal.

3.  The clerk shall ensure that all pending motions in this case and in CV 22–

32–BLG–SPW are terminated and shall close the civil file by entering judgment in

favor of the United States and against Edwards.

DATED this ____ day of _____, 2024.


_____
Susan P. Watters, District Judge
United States District Court